ROSE LEDA EHLER (SBN 296523)
rose.ehler@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100

ELAINE J. GOLDENBERG
elaine.goldenberg@mto.com
DANIEL J. KANE
daniel.kane@mto.com
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, DC 20001
Telephone: (202) 220-1114

Attorneys for Amicus Curiae Recording
Industry Association of America

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SPENCER ELDEN,<br><br>    Plaintiff,<br><br>    vs.<br><br>NIRVANA, L.L.C., *et al.*,<br><br>    Defendants. | Case No. 2:21-cv-06836-FMO-AGR<br><br>**BRIEF OF AMICUS CURIAE RECORDING INDUSTRY ASSOCIATION OF AMERICA IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:        December 5, 2024<br>Time:        10:00 AM<br>Courtroom:  6D<br><br>Judge:  Hon. Fernando M. Olguin |

1

## **CORPORATE DISCLOSURE STATEMENT**

2   The Recording Industry Association of America is a nonprofit corporation that

3 does not have a parent corporation, is not owned in any part by a publicly held

4 corporation, and is not a government entity.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF CONTENTS ........................................................................................ii

TABLE OF AUTHORITIES ..................................................................................iii

INTEREST OF AMICUS CURIAE ....................................................................... 1

INTRODUCTION ................................................................................................... 2

ARGUMENT ........................................................................................................... 2

I.    The First Amendment Protects Album Cover Art, Including The *Nevermind* Cover ................................................................................. 3

    A.    The First Amendment Safeguards All Forms of Artistic Expression ....................................................................................... 3

    B.    Album Cover Art Is Core Artistic Expression Protected by the First Amendment ......................................................................... 5

    C.    The *Nevermind* Cover Art Is Artistic Expression Protected by the First Amendment .................................................................. 14

II.    Accepting Plaintiff's Theory Of Liability Would Harm The Recording Industry And Chill Artistic Expression ......................................... 18

CONCLUSION ..................................................................................................... 20

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**FEDERAL CASES**

4

*303 Creative LLC v. Elenis,*

5

   600 U.S. 570 (2023) ........................................................................ 5, 6

6

*Animal Legal Def. Fund v. Wasden,*

7

   878 F.3d 1184 (9th Cir. 2018) ............................................................ 14

8

*Armstrong v. Eagle Rock Ent.,*

9

   655 F. Supp.2d 779 (E.D. Mich. 2009) .............................................. 14

10

*Ashcroft v. Free Speech Coal.,*

11

   535 U.S. 234 (2002) ............................................................... 3, 16, 19

12

*City of Lakewood v. Plain Dealer Publ'g Co.,*

13

   486 U.S. 750 (1988) ............................................................................ 5

14

*Cohen v. California,*

15

   403 U.S. 15 (1971) ............................................................................ 18

16

*Counterman v. Colorado,*

17

   600 U.S. 66 (2023) ............................................................................ 18

18

*EMI Christian Music Grp. v. MP3tunes, LLC,*

19

   844 F.3d 79 (2d Cir. 2016) ................................................................ 12

20

*FCC v. Pacifica Found.,*

21

   438 U.S. 726 (1978) .......................................................................... 18

22

*Harper & Row Publishers, Inc. v. Nation Enters.,*

23

   471 U.S. 539 (1985) .......................................................................... 12

24

*Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston, Inc.,*

25

   515 U.S. 557 (1995) ............................................................................ 5

26

*Joseph Burstyn, Inc. v. Wilson,*

27

   343 U.S. 495 (1952) ............................................................ 4, 5, 13, 17

28

# TABLE OF AUTHORITIES

## (continued)

**Page(s)**

*Kaplan v. California*,
 413 U.S. 115 (1973) ........................................................................ 14

*Matal v. Tam*,
 582 U.S. 218 (2017) ........................................................................ 18

*Miller v. California*,
 413 U.S. 15 (1973) .......................................................................... 4

*New York v. Ferber*,
 458 U.S. 747 (1982) ........................................................................ 2

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
 502 U.S. 105 (1991) ........................................................................ 2

*United States v. Hill*,
 459 F.3d 966 (9th Cir. 2006) ........................................................ 16

*United States v. One Book Entitled Ulysses by James Joyce*,
 72 F.2d 705 (2d Cir. 1934) ..................................................... 3, 4, 17

*United States v. Perkins*,
 850 F.3d 1109 (9th Cir. 2017) ................................................. 16, 17

*United States v. Playboy Ent. Grp.*,
 529 U.S. 803 (2000) ........................................................................ 4

*White v. City of Sparks*,
 500 F.3d 953 (9th Cir. 2007) ................................................ 5, passim

*Winters v. New York*,
 333 U.S. 507 (1948) ........................................................................ 4

**FEDERAL STATUTES**

18 U.S.C. § 2256(2) ............................................................................ 2

18 U.S.C. § 2256(8) ........................................................................ 2, 16

# **TABLE OF AUTHORITIES**

## **(continued)**

**Page(s)**

**CONSTITUTIONAL PROVISIONS**

First Amendment ............................................................................ 1, passim

**LEGISLATIVE MATERIALS**

S. Rep. No. 104-358 (1996) .......................................................................... 16

**OTHER AUTHORITIES**

*The 100 Best Album Covers of All Time*, Rolling Stone (July 18, 2024),
   https://www.rollingstone.com/music/music-lists/best-album-covers-
   1235035232/nirvana-nevermind-4-1235039394/ .................................... 16

*The 100 Best Album Covers of All Time*, Rolling Stone (July 18, 2024),
   https://www.rollingstone.com/music/music-lists/best-album-covers-
   1235035232/the-clash-london-calling-8-1235039407 ........................... 13

*The 25 Most Iconic Album Covers Of All Time*, uDiscoverMusic (Oct.
   28, 2023), https://www.udiscovermusic.com/stories/25-iconic-
   album-covers/ ....................................................................................... 16

*Album cover for Nirvana, Nevermind*, MoMA,
   https://www.moma.org/collection/works/188966 (last accessed Sept.
   13, 2024) .............................................................................................. 16

Alex Allenchey, *Art 101: How the Upheaval of the '90s Revolutionized
   the Art World*, Artspace (Feb. 26, 2013),
   https://www.artspace.com/magazine/art_101/art_market/the_art_wo
   rld_in_the_90s-5912 ............................................................................. 13

# **TABLE OF AUTHORITIES**

## (continued)

Page(s)

Alex Greenberger, *The Story Behind Andy Warhol's 'Velvet Underground and Nico' Cover, the Newly Crowned Best Album Art of All Time*, ARTnews (Aug. 9, 2023), https://www.artnews.com/art-news/news/andy-warhol-velvet-underground-and-nico-cover-banana-explained-1234676723/ ............................9

Anne Wallentine, *Beyond cute: a brief history of cupids, cherubs and putti in art*, Art UK (Sept. 26, 2024), https://artuk.org/discover/stories/beyond-cute-a-brief-history-of-cupids-cherubs-and-putti-in-art ...........................................................17

Ben Sisario, *Vinyl Is Selling So Well That It's Getting Hard to Sell Vinyl*, N.Y. Times (Oct. 21, 2021), https://www.nytimes.com/2021/10/21/arts/music/vinyl-records-delays.html ............................................................................................19

*Buzzcocks, Orgasm Addict*, MoMA, https://www.moma.org/collection/works/156037 .................................................10

Chris Lee, *Lady Gaga unveils her Jeff Koons-designed 'Artpop' album cover*, Los Angeles Times (Oct. 8, 2013), https://www.latimes.com/entertainment/music/posts/la-et-ph-lady-gaga-jeff-koons-artpop-album-cover-20131007-story.html ................................11

Christopher Vezza, *Nirvana's Nevermind: an album artwork expert decodes the famous underwater baby cover*, The Conversation (Sept. 23, 2021), https://theconversation.com/nirvanas-nevermind-an-album-artwork-expert-decodes-the-famous-underwater-baby-cover-166801 ........................................................................................15

Brief of Amicus Curiae in Support of Defendants' Motion for Summary Judgment

## **TABLE OF AUTHORITIES**

### (continued)

Page(s)

Francesco Spampinato, *Art Record Covers* (J. Wiedemann ed. 2021) ...................... 6

Jean Sorabella, *The Nude in the Middle Ages and the Renaissance*, The
  Metropolitan Museum of Art (Jan. 2008),
  https://www.metmuseum.org/toah/hd/numr/hd_numr.htm ................................ 17

Joe Hagan, *The Rolling Stones,* Sticky Fingers*, and the Man Who Made
  the Most Notorious Album Art of 1971*, Vanity Fair (Apr. 15, 2021),
  https://www.vanityfair.com/style/2021/04/the-man-who-made-the-
  most-notorious-album-art-of-1971 ..................................................................... 9

Joe Lynch, *The 100 Best Album Covers of All Time*, Billboard (Aug. 7,
  2023), https://www.billboard.com/photos/best-album-covers-of-all-
  time-6715351/1-aretha-franklin-young-gifted-black-1972-billboard-
  1240/ ............................................................................................................. 16

Joe Taysom, *The Cover Uncovered: The story behind Nirvana's
  'Nevermind' artwork*, Far Out Magazine (Dec. 10, 2022),
  https://faroutmagazine.co.uk/nirvana-nevermind-cover-story/ ........................... 15

Martin Chilton, *Cover Story: A History of Album Artwork*,
  uDiscoverMusic (Feb. 23, 2024),
  https://www.udiscovermusic.com/in-depth-features/history-album-
  artwork/ ("*Cover Story*") ............................................................................... 6

Michael Price, *Wall of Sound: Music from the Collection of Yoshitomo
  Nara and the Art of Inspiration*, LACMA (Sept. 30, 2020),
  https://unframed.lacma.org/2020/09/30/wall-sound-music-
  collection-yoshitomo-nara-and-art-inspiration ................................................. 12

**TABLE OF AUTHORITIES**

**(continued)**

**Page(s)**

Michele Romero, *The naked kid from Nirvana's "Nevermind*,"
    Entertainment Weekly (Apr. 24, 1992),
    https://ew.com/article/1992/04/24/naked-kid-nirvanas-nevermind/ ................... 15

*music sheet/cover*, The British Museum,
    https://www.britishmuseum.org/collection/object/C_2012-4006-1
    (last accessed Sept. 13, 2024) ................................................................. 16

Ollie Campbell, *The Designer of Nirvana's Nevermind Cover on
    Shooting Babies and Working with Kurt Cobain*, The Work Behind
    The Work, https://milanote.com/the-work/the-designer-of-nirvanas-
    nevermind-album-cover (last visited Sept. 13, 2024) ......................................... 15

Steve Jones & Martin Sorger, *Covering Music: A Brief History and
    Analysis of Album Cover Design* ................................................................. 6

*The Timeless Power of Album Art*, Good Design Australia (Aug. 7,
    2023), https://good-design.org/the-timeless-power-of-album-art/ ....................... 19

Weekend Edition Sunday, *Why The 'Sgt. Pepper's' Cover Art Matters
    As Much As The Music*, NPR (May 28, 2017),
    https://www.npr.org/2017/05/28/530362673/why-the-sgt-peppers-
    cover-art-matters-as-much-as-the-music .......................................................... 8

William Wordsworth, *The World Is Too Much With Us* (1807),
    https://www.poetryfoundation.org/poems/45564/the-world-is-too-
    much-with-us; ......................................................................................... 15

### **INTEREST OF AMICUS CURIAE**[1]

The Recording Industry Association of America ("RIAA") is a nonprofit trade organization that supports and promotes the creative and financial vitality of recorded music and the people and companies that create it.   RIAA's several hundred members—ranging from small artist-owned labels to global music businesses—make up this country's most vibrant and innovative music community.   RIAA members create, manufacture, and/or distribute sound recordings representing the majority of all legitimate recorded music consumption in the United States, and own copyrights and/or other exclusive rights in sound recordings embodying the performances of some of the most popular and successful recording artists of all time.   RIAA members further create, manufacture, and/or distribute the album art and related visual materials developed in association with those sound recordings, and own copyrights and/or other exclusive rights in that visual art.   RIAA supports and promotes the creative and commercial vitality of music labels in the United States by, among other things, working to protect the First Amendment rights of artists and recording-industry members.

Amicus and its members have a powerful interest in the proper resolution of this case.   Plaintiff Spencer Elden advances a far-reaching theory of liability that cannot be reconciled with the First Amendment, would chill artistic expression on album covers and similar media, and would harm the work of amicus's members.

---

[1] No party or counsel for any party authored this brief in whole or in part, and no person other than amicus or its counsel made any monetary contribution intended to fund the preparation or submission of this brief.   Certain of the defendants in this lawsuit are among the members of the Recording Industry Association of America, which also represents the interests of hundreds of other companies in the music industry.   All parties have consented to the filing of this brief.

1

## <u>INTRODUCTION</u>

2  The complaint in this case alleges that the iconic cover art on Nirvana's album
3  *Nevermind* is child pornography.  Plaintiff contends that the image on that cover—
4  one of the most celebrated visual works in the history of album art design—depicts a
5  minor engaging in "sexually explicit conduct."  18 U.S.C. § 2256(8).  But as
6  Defendants explain in support of their motion for summary judgment, that is incorrect
7  as a matter of law.  The album cover does not meet the definition of "sexually explicit
8  conduct" in 18 U.S.C. § 2256(2) or the case law applying that provision.  Just as
9  importantly, interpreting that statute to permit imposition of liability in this case
10  would violate the First Amendment, which safeguards artistic expression like that at
11  issue here.

12  Amicus submits this brief to explain in detail why imposing liability here would
13  violate the First Amendment.  The First Amendment protects not only album cover
14  art generally—an important artistic tradition in its own right—but also the *Nevermind*
15  cover in particular, which is neither obscene nor the product of child sexual abuse.
16  Accepting Plaintiff's theory of liability would have a serious chilling effect on the
17  recording industry and on artistic expression more generally.  The Court should reject
18  Plaintiff's speech-suppressive claim and grant summary judgment in Defendants'
19  favor.

20

## <u>ARGUMENT</u>

21  A statute is "presumptively inconsistent with the First Amendment if it imposes
22  a financial burden on speakers because of the content of their speech."  *Simon &*
23  *Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991).
24  Yet Plaintiff seeks to impose just such a burden here.  *See* Second Am. Compl. ¶¶ 104,
25  114, 134-135 (Jan. 12, 2022), ECF No. 25.

26  To attempt to justify that restriction, Plaintiff argues that the *Nevermind* cover
27  falls outside the First Amendment's protection because it constitutes child
28  pornography.  *See id.* ¶ 116 (citing *New York v. Ferber*, 458 U.S. 747 (1982)).  But

otherwise protected speech "does not fall outside the protection of the First Amendment" if it is "neither obscene nor the product of sexual abuse." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 251 (2002). The speech at issue here plainly is not obscene, as it does not appeal to "prurient interest," is not "patently offensive in light of community standards," and has "serious . . . artistic . . . value." *Id.* at 246. And the work is not the product of sexual abuse because (as Defendants explain at length) it is not child pornography: the work does not focus on Plaintiff's genitalia; the setting is not sexually suggestive; Plaintiff is not depicted in a pose unnatural for a four-month-old baby; the image does not suggest sexual coyness or willingness to engage in sexual activity; and the cover was not designed to elicit a sexual response in the viewer.

Instead, the *Nevermind* cover is the kind of vital artistic expression that lies at the core of the First Amendment's protection. Federal courts have long privileged such expression, building First Amendment doctrine around the essential premise that the law should not stifle artistic creativity. That doctrine applies squarely to art like the cover of the album *Nevermind*.

## I.    The First Amendment Protects Album Cover Art, Including the *Nevermind* Cover

### A.    The First Amendment Safeguards All Forms of Artistic Expression

For nearly a century, courts have recognized that a core function of the First Amendment is to preserve artistic expression. In one foundational decision, the Second Circuit shielded James Joyce's *Ulysses* from a statute prohibiting the importation of obscene materials, notwithstanding the novel's sometimes "extreme" "vulgarity," because Joyce had delivered "real art": "Joyce, in the words of Paradise Lost, has dealt with 'things unattempted yet in prose or rime'—with things that very likely might better have remained 'unattempted'—but his book shows originality and is a work of symmetry and excellent craftsmanship of a sort." *United States v. One Book Entitled Ulysses by James Joyce*, 72 F.2d 705, 706 (2d Cir. 1934). As the court

recognized, if the book's "erotic passages" were to "make the book subject to confiscation, by the same test Venus and Adonis, Hamlet, Romeo and Juliet, and . . . the Odyssey . . . , as well as many other classics, would have to be suppressed." *Id.* at 707.  And although the court doubted whether *Ulysses* would "last as a substantial contribution to literature," the court considered the "foolish judgments" of British courts that had "proscrib[ed] the works of Byron and Southey" a "warning to all who have to determine the limits of the field within which authors may exercise themselves." *Id.* at 708.

The Supreme Court soon reached the same conclusion: the First Amendment protects artistic expression.  In 1948, the Court held that even "sanguinary or salacious publications" were "as much entitled to the protection of free speech as the best of literature." *Winters v. New York*, 333 U.S. 507, 510 (1948).  In 1952, the Court held that motion pictures were entitled to First Amendment protection because "they may affect public attitudes and behavior in a variety of ways, ranging from direct espousal of a political or social doctrine to the subtle shaping of thought which characterizes all artistic expression." *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).  And in 1973, the Court warned lower courts "always [to] remain sensitive to any infringement on genuinely serious literary, artistic, political, or scientific expression." *Miller v. California*, 413 U.S. 15, 22-23 (1973).  Thus, in setting out what remains the test for obscenity, the Court explained that it would treat a work as obscene only if, "taken as a whole," it "lacks serious literary, artistic, political, or scientific value." *Id.* at 24.

That same concern with protecting artistic expression carries through to the Supreme Court's modern case law.  As the Court has explained, the First Amendment "exists precisely so that opinions and judgments, including esthetic and moral judgments about art and literature, can be formed, tested, and expressed.  What the Constitution says is that these judgments are for the individual to make, not for the Government to decree." *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 818

(2000).  As a result, "[a]ll manner of speech—from pictures, films, paintings, drawings, and engravings, to oral utterance and the printed word—qualify for the First Amendment's protections."  *303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023) (internal quotation marks omitted).  That is true even of works that lack a "succinctly articulable message," such as the "painting of Jackson Pollock, music of Arnold Schöenberg, [and] Jabberwocky verse of Lewis Carroll"—all of which are "unquestionably shielded" by the Constitution.  *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston, Inc.*, 515 U.S. 557, 569 (1995).

The Ninth Circuit has faithfully followed that precedent.  In *White v. City of Sparks*, 500 F.3d 953 (9th Cir. 2007), for example, the Ninth Circuit held that the First Amendment "protects an artist's original paintings," just as it protects "the arts and entertainment" generally.  *Id.* at 955-56.  As the court explained, a painting "conveys [the artist's] sense of form, topic, and perspective."  *Id.* at 956.  A painting "may express a clear social position," or simply the artist's "vision of movement and color."  *Id.*  Either way, the court held, a painting "holds potential to 'affect public attitudes' by spurring thoughtful reflection in and discussion among its viewers."  *Id.* (quoting *Joseph Burstyn*, 343 U.S. at 501).

The court of appeals also concluded that First Amendment protection applies with full force regardless of whether the painting is a commodity sold to a buyer for a price.  Whether a painting is auctioned for millions or given as a gift to the artist's mother, the level of constitutional protection is the same: "the degree of First Amendment protection is not diminished merely because the [protected expression] is sold rather than given away."  *White*, 500 F.3d at 956 (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 n.5 (1988)).

## B.    Album Cover Art Is Core Artistic Expression Protected by the First Amendment

As that precedent indicates, album cover art is core artistic expression that is entitled to the strongest level of First Amendment protection.  Although a relatively

recent innovation, album cover art is a vital and dynamic medium that is constitutionally indistinguishable from the "paintings, drawings, and engravings" that courts have long found to be at the center of the First Amendment's protections. *303 Creative*, 600 U.S. at 587 (citation omitted).

    1.  *History of album cover art.*  Album cover art first blossomed in the 1940s and 1950s.  *See* Martin Chilton, *Cover Story: A History of Album Artwork*, uDiscoverMusic (Feb. 23, 2024), https://www.udiscovermusic.com/in-depth-features/history-album-artwork/ ("*Cover Story*").  Before the Second World War, paper sleeves protecting records—typically described as "tombstones"—were nothing more than frames for labels affixed to the records themselves.  Steve Jones & Martin Sorger, *Covering Music: A Brief History and Analysis of Album Cover Design*, 11-12 J. Popular Music Studies 68, 71 (1999) ("*Covering Music*").  By the 1940s, however, illustrated album covers began to appear, and almost immediately a significant new genre of visual art was born.  *See Cover Story*.

    That new genre reflected work by numerous artists now recognized as giants of the art world.  For example, an illustrated image of a gold crown on Nat King Cole's 1945 album *The King Cole Trio* quickly became a "landmark artwork"—the first record cover to "attract[] mass attention in America," *Cover Story*—and encouraged cutting-edge artists to use popular music as an inspiration for their works.  By 1949, a young Andy Warhol was working for Columbia Records, producing a cover for an LP sponsored by the Museum of Modern Art.  *See* Francesco Spampinato, *Art Record Covers* 7 (J. Wiedemann ed. 2021).  By 1955, Salvador Dalí had produced an album cover for Jackie Gleason.  *Id.*  And within a few years, artists as diverse as Josef Albers, Joan Miró, Franz Kline, and Jean Dubuffet had created their own album covers.  *Id.* at 7-9.

Brief of Amicus Curiae in Support of Defendants' Motion for Summary Judgment

1
2
3
4
5
6
7
8
9



10   Salvador Dalí, Cover Art for *Lonesome Echo*, Jackie Gleason (Capitol Records 1955).

11         At the same time, lesser-known artists achieved major success creating album

12   cover art, particularly for jazz records.  *See Covering Music* 74.  S. Neil Fujita, for

13   example, illustrated all manner of jazz albums, aligning jazz with modern art in a style

14   reminiscent of Paul Klee.  *See Cover Story*.

15
16
17
18
19
20
21
22
23

24   S. Neil Fujita, Cover Art for *Time Out*, The Dave Brubeck Quartet (Columbia 1959).

25   Photographers, too, earned renown through album covers.  *See Cover Story*.  In 1956,

26   for example, Ella Fitzgerald and Louis Armstrong released the album *Ella and Louis*

27   with nothing but Phil Stern's photograph to identify the artists.  *Id.*  That era of

28

1  explosive creativity led Tony Bennet to remark that buying a record in the 1950s "felt
2  like you were taking home your very own work of art." *Id.*

3        By the 1960s, the tradition of album cover art that was simultaneously inspired
4  by an album's music and independently expressive was well established. *Art Record*
5  *Covers* 9. For example, with his avant-garde cover for the Beatles' 1967 album *Sgt.*
6  *Pepper's Lonely Hearts Club Band*, pop artist Peter Blake created an image that was
7  intended to give visual expression to "the final, famous chord of 'A Day In The
8  Life'"—resulting in a work of art that is widely regarded as "expand[ing] the notion
9  of what was possible" in a pop album cover. Weekend Edition Sunday, *Why The 'Sgt.*
10  *Pepper's' Cover Art Matters As Much As The Music*, NPR (May 28, 2017),
11  https://www.npr.org/2017/05/28/530362673/why-the-sgt-peppers-cover-art-matters-
12  as-much-as-the-music.

13        The 1960s also saw the rise of provoking, challenging album cover art that
14  reflected changing mores and spoke to the issues of sex and violence with which
15  American culture was then preoccupied. For instance, Andy Warhol conceived for
16  the Velvet Underground's debut 1967 album "an interactive album cover based on
17  sexual innuendo: a banana skin with the artist's name at the bottom tip and the
18  instruction to 'peel slowly and see,'" which would reveal a "pink banana underneath."
19  *Art Record Covers* 8.



Brief of Amicus Curiae in Support of Defendants' Motion for Summary Judgment

Andy Warhol, Cover Art for *The Velvet Underground & Nico*, The Velvet Underground and Nico (Verve Records 1967).  One author compared the effect to "peeling back a foreskin."  Alex Greenberger, *The Story Behind Andy Warhol's 'Velvet Underground and Nico' Cover, the Newly Crowned Best Album Art of All Time*, ARTnews (Aug. 9, 2023), https://www.artnews.com/art-news/news/andy-warhol-velvet-underground-and-nico-cover-banana-explained-1234676723/.     And the band's frontman, Lou Reed, explained that the cover made the album "into an erotic art show."  *Id.*

Just a few years later, the Rolling Stones asked Warhol to push the concept even further.  Joe Hagan, *The Rolling Stones,* Sticky Fingers*, and the Man Who Made the Most Notorious Album Art of 1971*, Vanity Fair (Apr. 15, 2021), https://www.vanityfair.com/style/2021/04/the-man-who-made-the-most-notorious-album-art-of-1971.  Warhol obliged, creating a striking cover for the album *Sticky Fingers* that depicted a "denim-clad crotch" with a "real, working zipper" that "pull[ed] down to reveal another crotch in white underwear."  *Id.*



Andy Warhol, Cover Art for *Sticky Fingers*, The Rolling Stones (Rolling Stones Records 1971).  That cover "invit[ed] the listener to engage intimately with the object of desire—both fetishized record and the rock star himself."  *Art Record Covers* 474.

And needless to say, the cover would have been "unimaginable in more conservative times." *Cover Story*.

In the 1970s and 1980s, punk music's "rebellious attitude" inspired a new wave of audacious album covers. *Art Record Covers* 9; *see Covering Music* 80 (describing punk's "provocative imagery" and "shock approach"). In 1977, for example, the artist Linder created for the punk band the Buzzcocks a memorable image—now featured as part of the Museum of Modern Art's permanent collection, *see Buzzcocks, Orgasm Addict*, MoMA, https://www.moma.org/collection/works/156037—of an "iron-headed naked woman with smiling mouths in place of nipples." *Art Record Covers* 312.



Linder, Cover Art for *Orgasm Addict*, Buzzcocks (United Artists Records 1977).

Such cutting-edge covers, which sometimes "shock[ed] . . . audiences," grew ever more common in ensuing years, ultimately becoming a "leitmotiv in both the art and music of the 1990s," *Art Record Covers* 10—the same period in which the album art at the center of this case was created. In that period, album cover artists created increasingly challenging works. Metallica, for instance, released a pair of album covers designed by famous artist Andres Serrano featuring photographs of the artist's own bodily fluids. *See id.* at 432. And in 2002, renowned painter Julian Schnabel

1 designed for the Red Hot Chili Peppers an album cover featuring a topless portrait of

2 Schnabel's daughter.  *See id.* at 426.



11 Julian Schnabel, Cover Art for *By the Way*, Red Hot Chili Peppers (Warner Bros.

12 Records 2002).

13     That tradition of boundary-pushing art continues to this day.  In 2013, for

14 example, Jeff Koons designed a cover for Lady Gaga's *Artpop* featuring a "nude

15 sculpture of Gaga" with a "metallic blue beach ball" between her legs, framed by cut-

16 off images of Botticelli's *The Birth of Venus*.  Chris Lee, *Lady Gaga unveils her Jeff*

17 *Koons-designed 'Artpop' album cover*, Los Angeles Times (Oct. 8, 2013),

18 https://www.latimes.com/entertainment/music/posts/la-et-ph-lady-gaga-jeff-koons-

19 artpop-album-cover-20131007-story.html; *see Art Record Covers* 304.



28 Jeff Koons, Cover Art for *Artpop*, Lady Gaga (Interscope Records 2013).

2. *Album cover art as artistic expression.* As that history illustrates, album art is a particularly valuable form of expression, "bundling art and social commentary in an accessible, populist way." *Art Record Covers* 45 (quoting Shepard Fairey). Accordingly, there is no basis for distinguishing between album cover art and any other visual form of expression as a constitutional matter. In other words, album cover art that is neither obscene nor the product of sexual abuse is protected by the First Amendment just like any other artistic work.

The fact that album cover art is associated with an album does nothing to strip such art of constitutional protection. Album cover art is not just an adjunct to another form of expression; it is art in its own right.[2] It regularly appears in curated settings like museums and books, where viewers do not have access to the music on the albums that the works first accompanied. *See, e.g.*, Michael Price, *Wall of Sound: Music from the Collection of Yoshitomo Nara and the Art of Inspiration*, LACMA (Sept. 30, 2020), https://unframed.lacma.org/2020/09/30/wall-sound-music-collection-yoshitomo-nara-and-art-inspiration; *Art Record Covers*. At the same time, this "new and alternative" art form is vital in part because it "does not necessarily need to be experienced within the walls of museums and galleries." *Art Record Covers* at 7. In that way, album art "resist[s] the constraints" of the art world it occupies, allowing "anyone [to] build an art collection." *Id.*

Further, the commercial aspect of album cover art is of no moment to the constitutional analysis. The Ninth Circuit has already rejected the argument that the sale of paintings "removes them from the ambit of protected expression," *White*, 500 F.3d at 956, and the Supreme Court has held that films retain First Amendment

---

[2] Indeed, cover art is itself protected by copyright, *see EMI Christian Music Grp. v. MP3tunes, LLC*, 844 F.3d 79, 96-97 (2d Cir. 2016), which reflects a judgment that such art is "expression" that "display[s] the stamp of the author's originality," *Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 547 (1985).

protection despite "large-scale" distribution, *Joseph Burstyn*, 343 U.S. at 501. The same must be true of album cover art as well.

Moreover, although no articulable message is necessary to trigger First Amendment protection, *see White*, 500 F.3d at 956, album cover art does indeed convey such messages. Such art exists in dialogue with what has come before, with the artistic vision of the musicians who created the album with which it is associated, and with developments in the wider art world and popular culture. For instance, when The Clash designed a cover for their 1979 album *London Calling*, they looked to Elvis Presley's 1956 debut album to convey that they were doing something novel, edgy, and outside of mainstream music: "When the Elvis record came out, rock & roll was pretty dangerous. . . . [And] when we brought out our record, it was dangerous stuff, too." *The 100 Best Album Covers of All Time*, Rolling Stone (July 18, 2024), https://www.rollingstone.com/music/music-lists/best-album-covers-1235035232/the-clash-london-calling-8-1235039407/.

 

William V. Robertson, Cover Art for *Elvis Presley*, Elvis Presley (RCA Victor 1956); Pennie Smith, Cover Art for *London Calling*, The Clash (CBS 1979). The album cover art of the 1990s conveys a similar message of edge and danger, seeking to spur "uncomfortable conversations about a rising generation that disregarded prevailing societal norms." Alex Allenchey, *Art 101: How the Upheaval of the '90s*

*Revolutionized the Art World*, Artspace (Feb. 26, 2013), https://www.artspace.com/magazine/art_101/art_market/the_art_world_in_the_90s-5912.

Like art that simply conveys the artist's "vision of movement and color," such art "holds potential to 'affect public attitudes' by spurring thoughtful reflection in and discussion among its viewers." *White*, 500 F.3d at 956 (citation omitted). That is at the heart of the First Amendment's protections.

## C.    The *Nevermind* Cover Art Is Artistic Expression Protected by the First Amendment

The same analysis applies to the cover of the album *Nevermind*. That cover is an artwork protected by the First Amendment, which means that the federal statute Plaintiff invokes cannot be applied to impose liability on Defendants for producing or distributing that work of art (unless strict scrutiny can be satisfied, which it cannot).

As Defendants explain in detail, the *Nevermind* cover sprung from a collaboration between members of the band Nirvana, their record label, and photographer Kirk Weddle. *See* Decl. of Robert Fisher ¶¶ 4, 6, 8, 13, ECF No. 25-1 (Joint Appendix 6-10) ("Fisher Decl."). The work depicts a naked baby, submerged in a pool, grasping at a dollar bill dangling from a fishhook. *See id.* ¶ 14.

That image is based on Weddle's photograph of Plaintiff. Photography, of course, falls just as firmly within the scope of the First Amendment as other kinds of art. *See Kaplan v. California*, 413 U.S. 115, 119 (1973). The artistic "decisions" that a photograph embodies—including decisions about "content, composition, lighting, . . . and angles, among others"—are "expressive in the same way as the written word or a musical score." *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018). And that expression is just as present when a photograph adorns a record as when a photograph is hanging on the wall of a gallery or reproduced in a book. *See, e.g.*, *Armstrong v. Eagle Rock Ent.*, 655 F. Supp.2d 779, 787 (E.D. Mich. 2009)

1  (holding that photographic cover art on DVD featuring live jazz performance is
2  protected by the First Amendment).

3        The image here also has expressive elements that go beyond the compositional
4  components of the photograph itself.  The fishhook and dollar bill are the results of
5  retouching, and the cover is further embellished with distorted text that itself reflected
6  technical innovation.  *See* Fisher Decl. ¶ 14; Ollie Campbell, *The Designer of*
7  *Nirvana's Nevermind Cover on Shooting Babies and Working with Kurt Cobain*, The
8  Work Behind The Work, https://milanote.com/the-work/the-designer-of-nirvanas-
9  nevermind-album-cover (last visited Sept. 13, 2024).  Those aspects of the image add
10 to its expressive quality.

11       Notably, although First Amendment protection does not depend on the
12 presence of some "message" in the artwork, *see* p. 5, *supra*, such a message exists
13 here.  The *Nevermind* cover is often described as illustrating—perhaps self-
14 consciously, for a band that only recently had received its first major paycheck—the
15 inevitable pull of materialism.  *See, e.g.*, Joe Taysom, *The Cover Uncovered: The*
16 *story behind Nirvana's 'Nevermind' artwork*, Far Out Magazine (Dec. 10, 2022),
17 https://faroutmagazine.co.uk/nirvana-nevermind-cover-story/;  Christopher Vezza,
18 *Nirvana's Nevermind: an album artwork expert decodes the famous underwater baby*
19 *cover*, The Conversation (Sept. 23, 2021), https://theconversation.com/nirvanas-
20 nevermind-an-album-artwork-expert-decodes-the-famous-underwater-baby-cover-
21 166801;  Michele Romero, *The naked kid from Nirvana's "Nevermind*,"
22 Entertainment Weekly (Apr. 24, 1992), https://ew.com/article/1992/04/24/naked-kid-
23 nirvanas-nevermind/; *see also White*, 500 F.3d at 956.  That artistic message is
24 enhanced by the subject's nudity, which indicates to the viewer that in our culture
25 even the most innocent baby, who has come into this world without possessions of
26 any kind, still cannot escape from the immediate and overwhelming temptation to
27 engage in "[g]etting and spending."  William Wordsworth, *The World Is Too Much*
28 *With Us* (1807),  https://www.poetryfoundation.org/poems/45564/the-world-is-too-

much-with-us; *see Free Speech Coal.*, 535 U.S. at 248 (discussing artistic works focusing on the "formative years" when "moral acts and self-fulfillment are still in reach").

Even now, more than 30 years after the album's release, the cover remains widely celebrated. The work routinely appears on lists of the greatest album covers of all time. *See* Fisher Decl. ¶ 14; *e.g.*, *The 100 Best Album Covers of All Time*, Rolling Stone (July 18, 2024), https://www.rollingstone.com/music/music-lists/best-album-covers-1235035232/nirvana-nevermind-4-1235039394/; *The 25 Most Iconic Album Covers Of All Time*, uDiscoverMusic (Oct. 28, 2023), https://www.udiscovermusic.com/stories/25-iconic-album-covers/; Joe Lynch, *The 100 Best Album Covers of All Time*, Billboard (Aug. 7, 2023), https://www.billboard.com/photos/best-album-covers-of-all-time-6715351/1-aretha-franklin-young-gifted-black-1972-billboard-1240/.

Moreover, the cover is specifically celebrated *as a work of art*. Indeed, the cover is part of the permanent collection of both the British Museum and the Museum of Modern Art. *See music sheet/cover*, The British Museum, https://www.britishmuseum.org/collection/object/C_2012-4006-1 (last accessed Sept. 13, 2024); *Album cover for Nirvana, Nevermind*, MoMA, https://www.moma.org/collection/works/188966 (last accessed Sept. 13, 2024).

That the *Nevermind* cover includes an image of a naked child does not change the First Amendment analysis. Amicus of course decries any form of child pornography. As the Ninth Circuit has explained, however, "not all images of nude children are pornographic." *United States v. Perkins*, 850 F.3d 1109, 1122 (9th Cir. 2017) (quoting *United States v. Hill*, 459 F.3d 966, 970 (9th Cir. 2006)). Rather, "the law recognizes that some images of nudity may merit First Amendment protection because they serve artistic or other purposes." *Hill*, 459 U.S. at 970; *see also* S. Rep. No. 104-358, at 20-21 (1996) (explaining that the language eventually codified at 18 U.S.C. § 2256(8) "does not, and is not intended to, criminalize or prohibit any

innocuous depiction of a minor," including "the proverbial parental picture of a child in the bathtub").  Thus, the Ninth Circuit has held that a photograph depicting a naked minor who was "not posed in a sexual position" and "not pictured with any sexual items" was not child pornography.  *Perkins*, 850 F.3d at 1122.

That precedent governs here, where the nudity at issue plainly serves a specific artistic purpose.  As explained, *see* pp. 15-16, *supra*, the *Nevermind* cover's commentary on the deep-seated draw of capitalism *depends* on the naked infant at the center of the frame.

In addition, the nudity in this case fits comfortably into a long history of representations of children appearing nude that everyone understands to be fine art rather than pornography.  For example, winged, naked children known as "putti" or "cherubs" are ubiquitous in the Renaissance and Rococo art that adorns the walls of museums across the world.  *See* Anne Wallentine, *Beyond cute: a brief history of cupids, cherubs and putti in art*, Art UK (Sept. 26, 2024), https://artuk.org/discover/ stories/beyond-cute-a-brief-history-of-cupids-cherubs-and-putti-in-art.  There is also a widespread, centuries-old tradition of representative paintings of the "naked Christ Child."  Jean Sorabella, *The Nude in the Middle Ages and the Renaissance*, The Metropolitan Museum of Art (Jan. 2008), https://www.metmuseum.org/toah/hd/ numr/hd_numr.htm.  Sometimes those depictions are based on "antique forms."  *Id.* But sometimes they yield lifelike images "with sex . . . exposed," *id.*—similar to the image on the *Nevermind* cover.

In all events, even if the artwork carried some other meaning (or no meaning at all), it has *already* "'affect[ed] public attitudes' by spurring thoughtful reflection in and discussion among its viewers."  *White*, 500 F.3d at 956 (quoting *Joseph Burstyn*, 343 U.S. at 501).  It is, in other words, a work of "originality" that would not have "sustain[ed] [its] high position with no better warrant for [its] existence than . . . obscene content."  *One Book Entitled Ulysses*, 72 F.2d at 708.

## II.    Accepting Plaintiff's Theory of Liability Would Harm the Recording Industry and Chill Artistic Expression

Because it has been clear for nearly a century that the First Amendment safeguards artistic expression, the recording industry has long operated on the understanding that album cover art is constitutionally protected speech. The result has been a remarkable run of artistic creativity. *See* pp. 5-14, *supra*. But accepting Plaintiff's claim here would chill that form of expression, which would in turn harm the recording industry. In addition, even outside the context of album cover art, such a marked change in fundamental First Amendment doctrine would negatively affect artists' ability to freely create and display their artistic works.

To start, accepting Plaintiff's claim would seriously chill the creation of new album cover art. As the Supreme Court has explained, government officials cannot reliably draw principled distinctions on matters of taste and style. *See Cohen v. California*, 403 U.S. 15, 25 (1971); *see id.* ("one man's vulgarity" is often "another's lyric"). And once the door to censorship opens, government officials too often seize the opportunity for "banning the expression of unpopular views." *Id.* at 26. That is why the Supreme Court has explained repeatedly that "the fact that society may find speech offensive is not a sufficient reason for suppressing it." *FCC v. Pacifica Found.*, 438 U.S. 726, 745 (1978); *see Matal v. Tam*, 582 U.S. 218, 244 (2017) (collecting cases).

If the *Nevermind* cover were somehow deemed to be outside the scope of the First Amendment's protections, then recording artists and the recording industry more generally would become "unsure" about the scope of their rights, "worr[ied] that the legal system will err," and "concerned about the expense of becoming entangled in the legal system." *Counterman v. Colorado*, 600 U.S. 66, 75 (2023). That would in turn lead everyone involved in creating and producing album cover art to be more "cautious and restrictive," so as to be sure to "steer[] wide[]" of any newly expanded "unlawful zone" of expression. *Id.* (internal quotation marks omitted).

1        That chilling effect would not only undermine the values that the First

2  Amendment protects but also would harm the recording industry. Album art is an

3  integral part of that industry, as "much a part of a record as the sound." *The Timeless*

4  *Power of Album Art*, Good Design Australia (Aug. 7, 2023), https://good-design.org/

5  the-timeless-power-of-album-art/. Industry members devote meaningful resources to

6  album cover art—particularly since vinyl records have once again become the

7  industry's highest-grossing physical format. *See* Ben Sisario, *Vinyl Is Selling So Well*

8  *That It's Getting Hard to Sell Vinyl*, N.Y. Times (Oct. 21, 2021),

9  https://www.nytimes.com/2021/10/21/arts/music/vinyl-records-delays.html. That is

10 because they understand such art to encourage customers to purchase music or

11 otherwise engage with recording artists on whose albums that art appears.

12       The chilling effect also would likely reach far beyond the recording industry.

13 *See, e.g.*, *Free Speech Coal.*, 535 U.S. at 248 (describing popular films that could fall

14 within an overbroad interpretation of child pornography); *see also* p. 17, *supra*

15 (discussing "putti" and "cherubs"). The art in this case is similar to countless other

16 works, in various media, long understood to reflect not child abuse but an "enduring

17 fascination with the lives and destinies of the young." *Free Speech Coal.*, 535 U.S.

18 at 248. If "no children were harmed in producing the image[]," such works cannot

19 possibly support civil liability. *Id.* at 256. And if the rule were otherwise, entire

20 genres of art would be subject to government censorship.

21       The Court should resolve this dispute swiftly. Plaintiff has abandoned most of

22 his theories of liability, *compare* Compl. (Aug. 24, 2021), ECF No. 1, *with* Second

23 Am. Compl. (Jan. 12, 2022), ECF No. 25, and—as Defendants explain—there is no

24 genuine dispute of material fact as to whether the *Nevermind* album art is lascivious.

25 Accordingly, judgment should not be deferred to a jury trial. Instead, this Court

26 should confirm now that the First Amendment protects the landmark work of art at

27 issue in this case.

28

1

## <u>CONCLUSION</u>

This Court should grant Defendants' motion for summary judgment.

DATED: October 30, 2024          MUNGER, TOLLES & OLSON LLP

By:  /s/ *Rose Leda Ehler*
Rose Leda Ehler

Attorney for Amicus Curiae Recording Industry Association of America

Brief of Amicus Curiae in Support of Defendants' Motion for Summary Judgment