# United States District Court
## Central District Of California

Spencer Elden
Plaintiff

vs

Nirvana LLC, el al,
Defendants

Case No. 2:21-cv-06836-FMO-AGR

NOTICE OF MOTION, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF LEAVE TO FILE A BRIEF AS AMICUS CURIAE

Date: July 3, 2025
Time: 10:00 AM
Courtroom: 6D

FILED
CLERK, U.S. DISTRICT COURT
JUL 21 2025
CENTRAL DISTRICT OF CALIFORNIA
BY DEPUTY

PLEASE TAKE NOTICE that at 10:00 AM on July 3,2025, or as soon thereafter as the matter may be heard, in the Courtroom of the Honorable Fernando M. Olguin, United States District Judge, located at 350 W. 1st Street, Courtroom 6D, Los Angeles, California, amicus curiae American Citizen Timothy Fredrickson, will and hereby does move for leave to file the attached brief as amicus curiae in support of Defendants' motion for summary judgment.

This Court has inherent authority to allow the participation of amici curiae. Fredrickson's participation as amicus curiae would be useful and desirable because it would facilitate a more complete understanding of the issues before the Court. This motion is based on this Notice of Motion and Motion, the accompanying Memorandum in Support of the Motion, all papers and pleadings on file in this action, and such further evidence and argument as may be presented to the Court in connection with the motion.

This motion is made following the filing of each party's joint stipulation. Fredrickson understands that the parties intend to file a joint stipulation addressing how they would like to proceed in responding to this and any other amicus brief.

Dated:  May 29 2025

/s/ Tim Fredrickson

## MEMORANDUM OF POINTS AND AUTHORITIES

**INTRODUCTION**

Fredrickson respectfully moves for leave to file the attached brief as amicus curiae to assist the court in a comprehensive constitutional, not statutory, analysis under the First Amendment's Free Speech clause. Fredrickson is an independent legal scholar and concerned citizen with a long-standing interest in First Amendment jurisprudence and evolving constitutional interpretations related to child sex abuse material (CSAM), privacy rights, and the scope of unprotected speech. The proposed amicus brief offers a thorough analysis of the nuanced constitutional questions raised by Plaintiff's claims, especially as they intersect with the legal status of expressive conduct, privacy waivers, and the modern terminology shift from "child pornography" to "child sex abuse material". This brief is overall neutral to the parties, and supports arguments raised by both plaintiff and defendants. Fredrickson is a natural born citizen of the United States and experienced in this specific area of law. Amicus and other citizens have a powerful interest in the proper resolution of this case, which will have far-reaching legal implications in the affirmation and clarification of constitutional standards.

This submission may assist the Court by:

1. Clarifying the analytical structure used to distinguish protected expressive conduct from unprotected content.

2. Addressing potential misconceptions related to terms like "child porn" versus "CSAM."

3. Offering a comparative view of relevant jurisprudence, including how other courts have treated similar questions of artistic expression, harm, and constitutional significance.

Plaintiff Spencer Elden seeks to use government process that, if successful, will censor a portion of the Nation's expression. The statute does not provide a defense for protected speech and therefore lacks adequate due process before censoring that speech. Court's routinely read-in First-Amendment defenses. The attached amicus brief discusses the central considerations referred here in short-hand as "harm". Plaintiff Elden has alleged various types of harm, which adversarial testing may reveal to be false. At the same time, further harm or facts supporting it may be uncovered in further proceedings such as trial.

1    The defendants and the Recording Industry Association of America ("RIAA") together each highlight

2    elements of a First Amendment defense. For example, the RIAA emphasizes and lends legitimacy to one or

3    more expressive components  --the trigger for a free speech inquiry. Next, the defendants assert a lack of

4    harm and point to facts that any harm is disingenuous. The First Amendment requires that harm be present.

6    The attached amicus brief outlines well-established  --and constitutionally grounded--  forms of harm.

7    In the interest of justice, fairness, and to avoid politicizing the inquiry; The jury is the most appropriate

8    fact-finder of whether harm was present and Mr Elden simply made the best of a bad situation, or whether

9    there was no real harm. Support for the jury's role comes from obscenity case law's "community standards".

11    Section 2255 may appraise harm when found, but should *not* be construed as irrebutably presuming

12    the harm itself. A statute cannot ward off constitutional inquiry by presuming unprotected harm.

14    **ARGUMENT**

15    A "district court has broad discretion" as to whether to allow "amici curiae" to file briefs. Hoptowit v.

16    Ray, 682 F.2d 1237, 1260 (9th Cir. 1982), (abrogated on other grounds by Sandin v. Conner, 515 U.S. 472

17    (1995)). The "classic role" of amici curiae is "assisting in a case of general public interest, supplementing

18    the efforts of counsel, and drawing the court's attention to law that escaped consideration." Miller-Wohl

19    Co., Inc. v. Comm'r of Labor & Indus., 694 F.2d 203, 204 (9th Cir. 1982). Here, crucial and specific First

20    Amendment factors regarding harm would risk being overlooked without this supplement to counsel's

21    efforts. The public deserves a detailed explanation based on a full and complete consideration of every

22    fact  --the public has little interest in waived and incomplete technical victories whether stemming from

23    calculated gamesmanship or intentional avoidance of inconvenient legal nuances.

25    District courts—including courts in this District—"frequently welcome amicus briefs from nonparties

26    concerning legal issues that have potential ramifications beyond the parties directly involved or if the

27    amicus has unique information or perspective that can help the court beyond the help that the lawyers for

28    the parties are able to provide." Safari Club Int'l. v. Harris, 2015 WL 1255491 at *1 (E.D. Cal. Jan. 14,

2015) (internal quotation marks omitted). And "[t]here are no strict prerequisites that must be established prior to qualifying for amicus status; an individual seeking to appear as amicus must merely make a showing that his participation is useful to or otherwise desirable to the court." Stross v. Glass Homes, Inc., No. 2022 WL 21310031, at *1 (C.D. Cal. Apr. 4, 2022) (internal quotation marks omitted).

The Court should grant the Fredrickson leave to file an amicus brief. The Fredrickson brings unique information and perspective to bear on the constitutional issues presented in this case. See Missouri v. Harris, 2014 WL 2987284, at *2 (E.D. Cal. July 1, 2014) ("An amicus brief should normally be allowed when, among other considerations, the amicus has unique information that can help the court beyond the help that the lawyers for the parties are able to provide." (internal quotation marks omitted)). Fredrickson has experience in specific First Amendment unprotected characteristics  --the lack of which is a defense-- as the brief in this case will explain.

It bears repeating that the Court should grant leave for Fredrickson to file an amicus brief because this case implicates important public interests, including vital interests in free expression. Because the case implicates a fundamental constitutional right and carries "potential ramifications beyond the parties directly involved," leave to file an amicus brief is warranted here. California v. U.S. Dep't of Labor, 2014 WL 12691095, at *1 (E.D. Cal. Jan. 14, 2014) (internal quotation marks omitted).

## CONCLUSION

For the foregoing reasons, and because no other citizen has spoken up for themselves in a personal capacity unrelated to business which may cloud judgement, Fredrickson respectfully requests that the Court grant leave to file an amicus brief in support of a searching First Amendment inquiry within or without each party's motion for summary judgment.

/s/ Tim Fredrickson

Dated: May 29, 2025

United States District Court
Central District of California

Spencer Elden,
Plaintiff

vs

Nirvana L.L.C. et al,
Defendants,

No. 2:21-cv-06836-FMO-AGR

Amicus Brief meaningfully defining aspects
of the unprotected category of *child* porn

No one defends child pornography. There is no pro-child-porn position any more than there is a public pro-slavery position for labor. The only issue is defining it in a way that nothing anyone wants to defend is covered. Many states either now divert young producers and possessors, or exclude pubescent (aka teen) images entirely[1]. In other states, their child pornography laws have always been synchronous with their rape laws --that is, a rape occurs well before the photograph of the act. The New York law in *Ferber* took this last approach *and* provided a mistake of age defense. The Ohio law in *Osborne* had broad "exemption and 'proper purposes' provisions". id @112. So far these are all *statutory* definitions, but this court must compare it with *the First Amendment's* "definition".

There is near *universal* agreement that nobody wants to defend any *sexual* conduct involving *pre*pubescent children. Take away the *sexual* conduct and you have the average family photo of a child splashing nude in the sink (or pool). Take away the *pre*pubescence (so teen-age material) and people begin to debate what should be covered and why. Regarding what to call this as a *category*, professionals in the field such as psychologists, officers and judges have begun to refer to "Child Pornography" as "Child Sex-Abuse Material" ("CSAM") to reflect the reality of what the heinous images are. Society is now asking that we update terminology[2], but there is a problem with umbrella terms and shorthand descriptions --frequent use causes many of us to forget important nuances and core requirements[3]. The Supreme Court has been very clear that a law has to be more specific than "mere nudity"[4]. There are "special facts that have been deemed to have *constitutional* significance" *Bose Corp. v. Consumers Union, 466 US 485 @505 (1984)*. So what *are* those "special facts" that the *Constitution* uses to differentiate between a photo of sexual abuse and a proud parent's "photograph [of] their infant children or toddlers in the bath or romping naked on the beach",

*Massachusetts v. Oakes, 491 US 576 @592 (1989)*, because is also applies to the image *of **Spencer Elden**.*

1  See https://zenodo.org/records/1037397     See also   https://cyberbullying.org/sexting-laws
2  See  https://childrescuecoalition.org/educations/call-it-what-it-is-help-us-change-legislation-from-child-pornography-to-csam/
3  See Bose @505 ("a general description of the type of communication whose content is unworthy of protection has not, in and of itself, served sufficiently to narrow the category, nor served to eliminate the danger that decisions by triers of fact may inhibit the expression of protected ideas")
4  "nudity, without more is protected expression" New York v. Ferber, 458 U.S. 747, 766 (1982); See also Schad v Ephpaim, 452 us 61 @66 (1981) (*expression* may *not* "be prohibited solely because it displays the nude human figure. Nudity alone does not place otherwise protected material outside the mantle of the First Amendment")... note that expression was assumed arguendo

**Invoking the First Amendment: Expression and unprotected means of capturing or creating that expression**

Logically, "it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment *even applies*". *Clark v Nonviolence, 468 us 288 @ftn5 (1984)* (emphasis added)[5]. *This is not a question of protection*, but rather whether there is any speech or expression *at all*. Just like a book could be an expressionless collection of receipts, IRS ledger, mile log, or checkbook; pictures do not necessarily express. One of the reasons why child advocacy groups want to rename "child pornography" to CSAM is because the term "pornography" implies some sort of expression. The average person is offended by the notion that such an image could be expressive which in turn would trigger an *inquiry* into *potential* protection. Regarding this first initial step, the possibility of even invoking an inquiry, it is often sufficient to say that children who have not undergone puberty do not even know the love-language pornography is written in. This is the baseline, and there can't be any dispute on this point --a child engaged in sexual activity that their body does not understand, and that they do not even psychologically comprehend is Child Sex-Abuse Material at its core. There is no expression, just abuse of another human being. *If* there were expression, a very unlikely prospect, defendants are welcome to point any out at their peril, while keeping in mind that *if* there is expression, the Constitution's strict scrutiny still[6] permits punishment of harm directly at the harm's event horizon. Supreme Court precedent recognizes that preventing any of the following harms is a compelling interest:  1) physical injury; 2) mental harm; 3) violation of privacy; and 4) criminal conduct. Without chasing the pornography rabbit of *if* this image is porn nor *when* porn is expressive, clearly the defendants here have made the *initial* nondispositive showing that the edited[7] nude image of infant Spencer Elden is expressive.

---

5  See eg. City of Erie v PAP's AM., 529 us 277 @289 (2000) ("Being 'in a state of nudity' is not an inherently expressive condition ••• however, nude *dancing* ••• is expressive"); Hernandez-Gotay v US, 985 F.3d 71 (CA1 2021) ("cockfighting is not expressive conduct and so is unprotected by the First Amendment"); Slattery v Hochul, 61 F.4th 278 (CA2 2023) ("Evergreen has not shown that the acts of hiring, terminating, or continuing to employ persons are themselves expressive"); KKK v Kerick, 356 F.3d 197 @209 (CA2 2004) ("wearing masks"); Falcone v Dickerstein, 92 F.4th 193 (CA3 2023) (*One* person "refusing to wear a face mask is not expressive"); Allegheny v Ludlum, 301 F.3d 167 @177 (CA3 2002) ("Employer 'polling' is not expression"); Adventure Communs, inc., v Ky. Reg. Of Election Fin., 191 F.3d 429 @440 (CA4 1999) ("Of course, laws that do not touch or concern speech or expressive activity in the first instance do not raise First Amendment concerns"); Voting v Andrade, 488 Fed.Appx 890 @898 (CA5 2012) ("receipt & delivery of completed voter registration applications are not expressive"); Blau v Fort Thomas, 401 F.3d 381 @389 (CA6 2005) (" 'looking nice' and 'feeling good' about clothing one wears" not expression); Navratil v Racine, 101 F.4th 511 @ ftn11 (CA7 2024) ("simply observing an event does not communicate any particular message"); Mglej v Multnomah, 715 Fed.Appx 672 @672 @673 (CA9 2018) ("Nudity by itself is not expressive conduct"); US v Aguilar, 883 F.2d 662 @696 ftn 34 (CA9 1988) ("employment is not expressive activity"); Interpipe v Becerra, 989 F.3d 879 @895 (CA9 2018) ("Purchasing ink and paper is not expressive conduct"); US v Gilbert, 920 F.2d 878 @883 (CA11 1991) (using bathroom and doing laundry not expressive); Bombs v Lauderdale, 901 F.3d 1235 @1241 (CA11 2018) ("sitting down ordinarily not expressive"); US v Enrico, 643 Fed.Appx 873 @875 (CA11 2016) ("Participating in a security screening is not expressive conduct"); Nicopure Labs v FDA, 944 F.3d 367 @272 (D.C.App 2019) ("Free samples are not expressive conduct").

6  US v Playboy, 529 us 803 @813 (   ) quoting Sable Communications v FCC, 492 us 115 @126 (1989) ("The Government may [] regulate the content of constitutionally protected speech in order to promote a *compelling* interest **if** it chooses the least restrictive means to further the articulated interest").

7  This case concerns the distribution of the picture with fishing hook & money inserted, *not the one originally captured by camera.*

Keeping in mind that "[b]eing 'in a state of nudity' is not an inherently expressive condition" *City of Erie@289,* yet assuming this court concludes that the defendants have successfully shown social value such as expression or conveyance of ideas; There are several components of nude speech which have been deemed **un**protected by the First Amendment --the "special facts that have been deemed to have constitutional significance" *Bose @505.* These "special facts" include: 1) physical injury; 2) mental harm; 3) violation of privacy; and 4) criminal conduct. The First Amendment doesn't protect any aspect of speech that is inseparable from even one of these building blocks. The first two are self-explanatory and have been discussed in great detail by other courts. Courts have become over-reliant on them because they are almost universally present in cases involving Child Sex Abuse Material. This has led to the last two being largely neglected --often not being addressed at all. It is important to maintain the full picture, because it is increasingly common that young yet biologically mature citizens (i.e. teens) are involved in the memorializing of sexual activities where the first two are absent, but one of the other two is present.

For all humans, there are substantial risks associated with sexually explicit expression including regret, revenge porn, sextortion, or unwanted publication[8].   This case involves *who* has a right to take that risk, *when* there is a right to take it, and if a law may appropriately punish the mere *possibility*[9] of harm or instead must be limited to situations causing *actual* harm. To repeat, some laws merely require the *risk* of harm before applying a penalty, which may be a premature event that is protected or at least not *un*protected because it doesn't wait for the specific harms which the First Amendment doesn't protect. Whether this defect renders such laws *substantially* overbroad or not, a lack of harm in a particular instance would make the law unconstitutional *as-applied*[10] --allowing it to remain. An "as-applied" challenge resembles strict scrutiny when the claim is that statute doesn't wait for (i.e. goes beyond) unprotected speech. To put it simply, no harm no foul. The Supreme Court *does* expect such as-applied challenges[11].

---

8  Government itself does a significant amount of publication. A search warrant allows officers to view, and jury trial a whole community See also Doe v Boland, 698 F.3d 877 @882 (CA6 2012) ("By sharing the morphed images with defense counsel and court staff and displaying the images in a courtroom, Boland invaded those interests [in their reputations]"

9  Similar to criminalizing a felon's possession of firearms, many laws jump the gun and assume pictures either do or will cause harm All laws are designed to prevent harm  --and do so by existing--  but to criminalize an event on the *assumption* harm is suspect.

10  See also US v. Williams, 553 US 285, 128 S.Ct. 1830 @1844 (2008) "It was also suggested at oral argument that the statute might cover documentary footage of atrocities being committed in foreign countries, such as soldiers raping young children. See Tr. of Oral Arg. 5-7. Perhaps so, if the material rises to the high level of explicitness that we have held is required. That sort of documentary footage could of course be the subject of an as-applied challenge. The courts presumably would weigh the educational interest in the dissemination of information about the atrocities against the government's interest in preventing the distribution of materials that constitute "a permanent record" of the children's degradation whose dissemination increases "the harm to the child." Ferber, supra, at 759, 102 S.Ct. 3348. Assuming that the constitutional balance would have to be struck in favor of the documentary, the existence of that exception would not establish that the statute is substantially overbroad. The "mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." cite. In the vast majority of its applications, this statute raises no constitutional problems whatever."

11  See Ferber @773-774 "whatever overbreadth may exist *should* be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied."         Who caused the harm might be an equally important inquiry.

**Criminal acts as an unprotected "special fact"**

A criminal act is constitutionally significant. In fact, it has a category named after it, "speech integral to criminal conduct" or "criminal conduct integral to speech" focuses on that special fact. It has been suggested that child porn is actually a *subcategory*[12], which becomes more clear that this might be the case if we call it child *sex abuse* material. It is well established that criminal acts are not protectable elements of speech or expression. Nor does speech somehow preempt or negate a criminal act[13]. For example graffiti can have artistic beauty, but defacing public property is still a criminal act no-matter the skill. Lawmakers can *build upon* a criminal act and further criminalize any resulting speech so long as that speech is inseparable from *that person's* criminal act. The Supreme Court frequently refers to this as an "intrinsic" relationship[14]. Using arson as the crime, lawmakers could theoretically criminalize "arson for the purpose of producing a depiction" of it, where the "purpose" element requires a direct link between the criminal act of arson and the production of an image. Conversely, a generic possession ban might fail to require an "*intrinsic* link" between the crime and *that* person's possession of a photo; For example, if a news crew was documenting an arson's house fire, neither the news crew's production nor possession would be integral to the underlying crime of arson[15]. To repeat, mere possession, without more, does not tie *that person* to the underlying criminal act. If a law intends to fit within this particular exception to the First Amendment, it needs more than a "wouldn't exist but-for *someone's* criminal production" rationale[16], it must await actual crime --not predict crime or harm to thereby skip straight to criminalizing speech.

---

12  See Stevens @1586 ("Ferber thus grounded its analysis in a ***previously recognized***, long-established category of unprotected speech, and our subsequent decisions have shared this understanding."); See also id @1599 (Alito dissenting "In Ferber, an important factor — I would say the most important factor — was that child pornography involves the commission of a crime").

13  "It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute." Ferber @762 quoting Giboney v. Empire Storage & Ice Co., 336 U. S. 490 @498 (1949)

14  New York v. Ferber, 458 US 747 @759 (1982) (noting "The distribution of photographs and films depicting sexual activity by juveniles is **intrinsically** related to the sexual abuse of children in at least two ways");
 Massachusetts v. Oakes, 491 US 576 @593 (1989) (noting nudist colony's "denial of any **intrinsic** connection between public nudity and shame").
 Osborne v. Ohio, 495 US 103 @110 (1990) (noting "The advertising and selling of child pornography provide an economic motive for and are thus an **integral** part for the production of such materials, an activity illegal throughout the Nation");
 Ashcroft v. Free Speech Coalition, 535 US 234 @250 (2002) (noting "Virtual child pornography is not "**intrinsically** related" to the sexual abuse of children").
 US v. Stevens, 130 S.Ct. 1577 @1586 (2010) ("We made clear that Ferber presented a special case: The market for child pornography was "**intrinsically** related" to the **underlying abuse**, and was therefore "an **integral** part of the production of such materials, an activity illegal throughout the Nation.")
 Counterman v Colorado, 143 S.Ct. 2106 (2023) (Sotomayor/Gorsuch concurring) (noting "that recklessness is sufficient for child pornography ••• with its **integral** ties to **separate** criminal conduct")

15  That is, the crime of arson would have happened anyway, regardless of whether a picture was produced or possessed.
 *c f*  unless one of the news reporters influenced the arsonist to burn the building in hope of covering the story.

16  See also Ashcroft @241 (rejecting several theories that possession causes others to commit future crimes to produce more images).

While §2256 largely mirrors Chapter 109A's independently criminal rape and molestation of children, there appears to be no criminal act in the throwing of Mr Elden into water. However, there may be a local child-abuse law to satisfy that predicate --such that *that* criminal component of producing[17] renders the resulting image unprotected. Even if there is no underlying criminal act, it is important to note that the search for unprotected "special facts" doesn't end when and if there is no independently criminal act; The Supreme Court has identified at least *four other* "special facts that have been deemed to have constitutional significance" *Bose @505*. As such, when there is no underlying criminal act (or a person's non-involvement with the criminal act) the absence does ***not*** provide a get-out-of-jail-free card courtesy of the First Amendment.


**Privacy as the "special fact"**

An interest in privacy is another "special fact[] that ha[s] been deemed to have constitutional significance". *Bose @505*. The Supreme Court observed this long recognized privacy interest, defined as "the individual interest in avoiding disclosure of personal matters." *Ferber @ftn 9* quoting *Whalen v. Roe, 429 U. S. 589, 599 (1977),* and cast it as an unprotected aspect of speech, connecting it to both the production[18] and distribution[19] of sexual material --the most private human activity. There is unquestionably a privacy interest in mere nudity, an already strong interest which grows as it becomes more explicit. Consider a scale between nip-slip and overt sex. So what are the contours of privacy in its dual role as a safeguarded right *and* unprotected characteristic of speech? *If* it differs between adult and children, how? Does a camera *actually* complicate privacy? There are a few different aspects that must be considered before deciding how to apply it to Mr Elden's image.


As for the role of privacy, the extent to which the right to privacy is asserted, is the same extent to which invasion of that privacy is an unprotected aspect of any speech. This gives a rough guide for how the privacy interest draws a distinction between sexual abuse, "sextortion", voyeurism, unwanted publication/distribution, and the average family photo album chronicling a child's life that often contains a nude child splashing in the sink.

---

17  To avoid a conflict with the Stevens animal cruelty case, a criminal act must be integral to whatever step of production, possessing or distribution of "speech" is being targeted in a particular prosecution --that is, the "speech" is merely an aggravating factor.

18  See Ferber @ftn 9 ("When such performances are *recorded* and distributed, the child's privacy interests are also invaded")

19  See also Ferber @ftn 10 (observing that "*distribution* of the material violates 'the individual interest in avoiding disclosure of personal matters.' Whalen v. Roe, 429 U. S. 589, 599 (1977). Respondent cannot undermine the force of the privacy interests")

As for the contours of privacy, in practice it is a frustratingly fluid concept, especially in the realm of nudity. Where does any particular citizen draw their personal line of privacy? Where do we draw it for those who can't (or don't yet know how to) draw it? Consider provocatively revealing clothing, or for that matter nudist colonies --either example illustrates humans of all ages across the full spectrum. Considering the other end of the spectrum, can a law err on the side of caution and draw a line that assumes *maximum* privacy? The answer is yes, for several reasons: 1) at least *some* citizens want to safeguard their modesty and vindicate its invasion (yet wear a bikini); 2) surrendering privacy *is by degrees* instead of an easy binary dichotomy; and 3) the waiver can be *selective* as to certain parties (like a spouse or doctor) or depending on the social situation (such as the beach or movie set). The inherent uncertainty demonstrated by these realities presents a moving target for a legislature trying to safeguard the compelling interest in privacy, which increases the tolerable[20] amount of *facial* overbreadth in regards to privacy, while *as-applied* challenges remain ever-available to divert even the smallest amount of isolated[21] overbreadth if privacy is not violated (assuming the other compelling interests are likewise absent).

In practice, privacy naturally devolves into a debate. To illustrate, all can agree that sexual activity is a very private act, yet all would equally agree that there is no expectation of privacy if those sexual acts are performed in the middle of the street, yet we would change our minds again if we learned there was an unwilling participant. The necessary inquiry is whether: 1) if there was an expectation of privacy;  2a) if it was violated; or instead 2b) if it was intentionally or legally waived; and then either way  3) to what degree? Note the close resemblance to Fourth Amendment jurisprudence. One person cannot[22] waive another's privacy  --they instead violate it, hence this law. Many types of images fit nicely within this framework, which was recognized long before child images. Here, a fact-finder must determine if Elden had a right to privacy, if so then whether Elden can reasonably expect privacy in a public pool, and if so then whether privacy could be or was validly waived in 1991.

---

20

21  See Ferber @773-774 (finding *New York* CSAM law "not *substantially* overbroad and ••• whatever overbreadth may exist <u>should</u> be cured through *case-by-case* analysis of the fact situations to which its sanctions, assertedly, may not be applied."). More on this later.

22  cf  Parents give a (limited) waiver of their child's privacy at a hospital, and there may be another exception for youthful employment. Another way of looking at the issue would be asking if a child has a reasonable expectation of privacy, a situationally aware inquiry. Again there is a parallel with the Fourth Amendment's guarantee of privacy, albeit from government rather than other citizens. There is an open question regarding strip-searches in jails, or mandatory pat-searches at the airport or dance club

Whether nature or nurture, children certainly have a right to privacy, although its origin is not well defined[23]. Unless & until a citizen is able to draw the line themselves, a default is drawn for them by parents & *parens patrie*. As long as there *is* a reasonable expectation of privacy, and that privacy *was in fact violated*, the First Amendment will bend to this "special fact". Who drew the privacy line is far less important than those two facts. Lawmakers can punish those who cross the privacy line without offending the free speech clause. Without deciding when or if certain citizens (i.e. child or handicapped adult) are capable of drawing some lines of privacy for themselves, the *presumption* is that the line drawn by parents and government[24] is enforceable. Nobody doubts that a child's privacy is violated in *any* and *all* sexual situations, or that any consent ("waiver") can be invalidated or vetoed by a parent.


Another question is *when* society allows[25] one to take the reigns and decide where to draw a line of privacy. If a citizen of any mental capacity chooses to draw a very *restrictive* line, society is usually quick to defend it, but if one tries to draw a line that is more *relaxed* than most (i.e. when one wishes to *waive* privacy) we hesitate. It is ironic to hold that a zone of privacy is within the control of those seeking to assert but not waive it. Legally, parental authority ends at the earlier of either emancipation or 18; Government authority is a tougher question: Where lawmakers do ***not*** criminalize explicit forms of nudity, does that fact confer a constitutionally protected right *to privacy* in that same activity?[26] --one that can be asserted or waived without government interference? Even if limited interference is permitted, it is clear that Mr Elden's parents validly waived Spencer's privacy in what they believed to be (and may have been) their son's best social interest. Notwithstanding this legal waiver, Mr Elden should be able to rescind that waiver now that he is indisputably capable of making his own choices.

---

23  At risk of transitioning from legal opinion to academia, it appears that the assertion of privacy is intertwined with social, intellectual, and emotional development. Self's *initial* desire for sex-adjacent privacy is a taught behavior. *Later* desire for privacy comes with the onset of puberty and *only then* becomes inherent.

24  There is also debate here on who's job it is to draw which lines, as some parents wish to make a personal judgments drawing lines further forward (or backward) as the situation calls for it, while government cannot anticipate every single one of life's situations. For example some parents would rather their teen take the risks associated with sexting as opposed to risk pregnancy or STDs.

25  A societal override draws a distinction between   factual reality  and  legal recognition.

26  After Lawrence v Texas, 539 us 558 (2003), courts have struggled to define the right in a way that would not legalize prostitution and incest. This brief only considers privacy in its capacity as an *un*protected characteristic when it is *invaded* in relation to speech; We note this distinction with privacy, but do not address it in its Fourth Amendment capacity nor more specifically under what circumstances the government would be prevented from piercing the veil  --avoiding the implication of Lawrence as other courts do. A *positive* "legal acts" foundation for privacy would not protect prostitution or incest, but would confer a right to sexual privacy for many sixteen and seventeen year olds; As the Supreme Court has observed, the age of consent is sixteen, *federally* and in 39 states. See  Free Speech Coalition @247.   See also   Aid for Women v. Foulston, 327 F. Supp. 2d 1273, 1286-87 (D. Kan. 2004) *cf*. Planned Parenthood of Cent. Missouri v. Danforth, 428 U.S. 52, 74 (1976) ("[C]onstitutional rights do not mature and come into being magically upon when one attains the state-defined age of majority. Minors as well as adults are protected by the Constitution and possess constitutional rights."). Another positive, *marriage* , might confer a near limitless privacy right to teens or other classes.

Some suggest that if you have seen someone naked once before[27], that their privacy would not truly be violated *at all*[28] by seeing their naked body a second time[29] --measuring the invasion *per violator*, and expand this concept with the suggestion that photography is the ultimate invasion because *everyone* will eventually see. A dichotomy is unworkable. Consider married couples, where it is common to reserve very little *from each other* while sharing in many acts kept private *from the general public*. The same is true for other intimate couples. Consider also nudist colonies who have given an *almost* complete surrender of bodily privacy. One might think that citizens on a nude beach surrender *all* of their privacy, yet even they would consider it a gross invasion of privacy if you approached and attempted to count their pubic hair[30] or followed them to the toilet. This highlights the reality that expectations of privacy, or perhaps its waiver, is in degrees and conditional  --not a black and white dichotomy. This is to say that Mr Elden's parents may have given a limited waiver to the use of the infant's nude image, but not to the unlimited alteration and injection of sexual themes. At the same time, the image was produced in a public place albeit with limited public access.

This case has many facts cutting both directions in the inquiry of whether there was an expectation of privacy, if that expectation was reasonable, whether and under what circumstances privacy was waived or violated, and whether Spencer Elden can or did meaningfully revoke any waiver. These foundational facts should be determined by a fact-finder while a judge decides the legal implications of how these questions bear on the privacy exception to the first amendment that has picked up so much fire and fury in the context of nude images.

In conclusion, the Supreme Court has consistently pointed to four broadly conceptualized "special facts that have been deemed to have constitutional significance" *Bose @505*. These are mental harm, physical injury, invasion of privacy, and criminal action. The parties should submit evidence bearing on these "special facts" in the course of this civil action, so that a determination of first amendment protection can be made as soon as the facts support a determination either way. These special facts answer difficult questions in a variety of contexts.

---

27 Regardless of whether it was by *previously* violating their privacy,    or instead with consent (lets call this a "waiver" of privacy).
28 To repeat, it makes far more sense to observe *degrees* of a privacy violation, though perhaps any amount is actionable in court.
29 To clarify, in the context *of a picture,* it seems true that looking at the *same picture* a second time does no further invasion than the first.
30 An intentional analogy to the odd proposition of surrendering fingerprints because they are in "plain view".    See https://www.techdirt.com/2025/01/24/dc-appeals-court-compelling-fingerprint-production-to-unlock-phones-violates-fifth-amendment/

**Applying CSAM's four unprotected characteristics to various situations, when expression is present**

The *typical* family photo album's inclusion of a nude child does not involve physical harm during production; possession of such sensitive photos is typically private, rarely leaving a home, and not openly posted on websites; any distribution is typically limited to relatives or very close friends; and there is never a criminal act involved. Presumably our offspring is not mentally harmed when a parent walks down memory lane looking at that photo, however many teenage boys have been embarrassed by their mother's showing of such photos to the girlfriend, and while it would be unheard of for that son to call the police on their own mother (or an AUSA to prosecute) --be warned that good intentions may not eliminate mental harm, which is *always* an unprotected characteristic. Relatedly, if a thieving pedophile were to steal the photos: privacy would be violated, and the subjects would almost certainly suffer various unspecified mental harms  --either of which would "*un*protect" receipt, possession, and distribution of that photo.        The First Amendment *does* allow a family to have their cake and eat it too.


The typical photos taken on a nude beach are protected because there is no *physical* harm, no *mental* harm, no *criminal* act, and the *waiver of privacy* inherent in being voluntarily nude on such a beach. The same is true in nudist colonies. In either scenario --child or adult-- citizens do not expect privacy in what they publicly display. Something more would be needed to get around the First Amendment's attention to privacy for *production*[31]. Conversely, *distribution* of such images are likely *un*protected by virtue of mental anguish because later distribution may violate what little remaining piece of privacy was reserved, or cause mental harm. By analogy, consider a personal diary shown (or a secret told) to a friend  --if that "friend" later distributes the information widely. To state the obvious, distribution allows *others* to invade privacy on top of the original invasion (if there was one). Put differently, what separates production and possession from distribution is that the producer has *already* invaded privacy, while distributing is the act of enabling *others* to invade privacy  --a law may attribute that subsequent invasion of privacy to the distributor. To recap, the invasion *of privacy* caused by production happens only once because viewing is coextensive with production in regards *to privacy*. If *the producer* privately possesses, then no greater invasion *of privacy* has occurred beyond the production. Distribution is different because it is multiplicative in that more than one person can see and thereby invade privacy. Where production (and arguably private possession) are a one-and-done invasion of privacy *per person* who so produces, each act of distribution is presumably to new person(s) who only because of that act are able to invade privacy.

---

31  Harm should be more than being disgruntled if one photo left the confines of that beach or colony, which *this* court considers de minimus.

The average peeping Tom observes activities performed in seclusion (an obvious assertion of privacy);

That invasion of privacy is not protected by the First Amendment, so why would a picture be? The image would not exist but-for a means of production that the courts have deemed "not protected" --invasion of privacy.

It would be unnecessary to inquire into mental harm, and irrelevant whether there was physical harm. Improperly elevating the loose concepts of "porn" and "child" into tests to determine whether voyeurism, of what this amicus will *assume* to be children, needlessly complicates inquiry into in various situations such as:

1) Tanning salons. There is nothing expressed by merely tanning, so it would be a mistake to consider the First Amendment question *at all*. However *if* there were expression, violating privacy by observing (in person and/or by camera) would render the absorption of that expression unprotected regardless of whether they are a child or not.

2) Using the shower/toilet. Again there is no idea, emotion, or opinion expressed in those acts by themselves, however even *if* there was, violating privacy by observing (in person and/or by camera) renders it unprotected. Here privacy is again the obvious "special fact", no need to look for free-standing mental harm or physical harm.

3) Persons *under* the age of consent engaged in sexual play/experimentation. The burden of showing expression cannot be overlooked, but assuming it has been shown: If the victim was *induced*, a *crime* likely occurred, and in any event privacy was violated. If the act was voluntarily done *in private* then any observation (person or camera) would violate privacy, learning of that invasion would inflict mental harm, --both of those "special facts" are also present in possession and distribution of images. 4) A half-step back from voyeurism, if the victim self-produced a photo entirely on their own, protection is of-course dependent on a subsequent violation of privacy when (if) it is viewed by another person or distributed  --as presumably a person would not physically injure themselves nor inflict mental self-harm (at least not intentionally), and masturbation is not a crime anywhere in the United States[32]. Voyeurism also bares a strong resemblance to compelled speech, which the First Amendment *requires* suppressing.


The Supreme Court found *virtual* Child Sex Abuse Materiel protected by assuming expression, noting an absence of physical harm (because no victim exists), mental harm (same), and that no crime was committed in the course of creating the images[33]. Similarly, no person's privacy was invaded. Finally, it also went *beyond* obscenity. The ban reached a substantial amount of content that did not meet any one of these five unprotected characteristics.

32 This multi-factor test virtually mirrors the Canadian Supreme Court's "private use exception", available now for over three decades
33 id @250 ("In contrast to the speech in Ferber, speech that itself is the record of sexual abuse, the CPPA prohibits speech that records no crime and creates no victims by its production. Virtual child pornography is not "intrinsically related" to the sexual abuse of children").

Whether the Supreme Court was correct to find expression or not, there were at least no *un*protected "special facts".

The court expressly reserved whether any of these aspects could or would be present in "morphed pornography"[34].

Next, morphed pornography requires a double-inquiry of all five factors for *both* images *and* the end-picture. Involvement of the additional person and consideration of all three depictions each make it much more likely to locate an unprotected "special fact". The nature of morphed pornography rarely involves physical injury or a criminal act in the original pre-morphed images. Instead, the predominant special facts are mental harm, privacy, and obscenity. Privacy is of special note, because it frequently involves a *simulated* invasion which --whether deemed either not "constitutionally relevant" or significantly less so--  almost certainly causes mental anguish[35]. The US v Bach, 400 F.3d 622 (CA8 2005) court correctly ended inquiry after finding one of the *source* images was of a naked child in a tree with penis prominently exposed  --that is to say production of the *morphed* image involved *viewing the tree penis image* which was the typical actual invasion of privacy. In case you missed it, the morphed image could not be produced without viewing the original image (violating privacy) of the naked child *which was already*[36] unprotected. The US v Anderson, 759 F.3d 891 @895 (CA8 2013) case was slightly harder, with a child head on an adult body. It assumed there were no unprotected special facts in regards to the image of the adult's sexual photo, and in the child-sourced image noted the general lack of *physical* harm. id @895. This was such a case where only the *simulated* invasion of privacy occurred. The child was "falsely portrayed" in something they did not do. The court ultimately found both a privacy violation, and mental harm stemming from it. Importantly, it acknowledged that there could be an unconstitutional application of the statute(s) to morphed porn. This document showcases the framework that would be applied to find it. Consider Miley Cyrus, who as an adult googled a picture of her child-hood self, taking the head of alter ego Hannah Montana and placing it on 5 adults in sexually explicit exhibitions[37]. Neither Miley nor the 5 adults were physically injured when either of the original pictures were produced; there was no crime committed in filming Miley's Hannah Montana, nor in snapping a photo of the adults; entirely absent is any assertion of mental harm regarding *the original* images or that privacy was violated.

---

34  id @242 ("Although morphed images may fall within the definition of virtual child pornography, they implicate the interests of real children and are in that sense closer to the images in Ferber. Respondents do not challenge this provision, and we do not consider it").

35  Otherwise the person(s) within the image would have done the depicted act outright, if it was possible.  *cf*  Placing *oneself* in the image of a common porno or celebrity sex tape is a common fantasy. There are other exceptions as Miley Cyrus shows us later.

36  See Anderson @894 "we reasoned that the morphed image in Bach 'implicat[ed] the interests of a real child *and ••• record[ed] a crime*'" (alteration and emphasis in original). See cf Dean Boland's blunder as tech expert and lawyer in Ohio court.

37  https://www.oregonlive.com/movies/2014/12/free_the_nipple_campaign_gains.html

The uniquely rare aspect is that the person who simulated a child Miley's violation of privacy was an *adult Miley,* who as an adult has *full* authority to waive privacy --actual or simulated. Ms Cyrus has not claimed any mental or emotional harm following its wide dissemination. There are no *un*protected characteristics in *this* instance unless a community finds it obscene. Perhaps others will express themselves as Miley has done, requiring this important test

Simulated sexual conduct in Hollywood films and national TV cannot claim a "popularity" exemption. First consider Dev Patel, who at 16 dropped out of High School to star in MTV's *skins* "simulating sex and taking drugs"[38]. Privacy was waived similar to Nirvana. There was no criminal act because pure simulation is essentially faking a crime --an everyday thing on Hollywood Movie sets. There was no physical harm. Mr Patel has not claimed mental harms from anything he did on the movie set (production) or from public broadcast (distribution) --a double inquiry. And finally, no city has yet found the movie obscene. Second consider Brooke Shields' at 14 while playing a child prostitute in the 1978 film *Pretty Baby* or at 15 as a teenager discovering her sexuality in the 1980 film *The Blue Lagoon*, or her ads for *Calvin Klein* scantily clad in blue jeans –all of which many condemn as "child porn" without performing any actual test. Brooke Shields herself has not claimed any harm --though she sees the exploitative nature of the business as clearly as anyone[39]. There are many other cases: Assuming the *statute* reaches the images of Olivia Hussey and Leonard Whiting who were 16 and 17 at the time of filming in 1968[40] when Franco Zeffirelli directed his version of Romeo and Juliet, some of the *Constitution*'s inquiry into special facts will probe allegations that "some of the nudity in the final cut was filmed without their knowledge or consent"[41]. Similarly, in making the "butter" scene for the explicit movie *Last Tango in Paris* in 1972, female lead Maria Schneider was not told what was going to happen before the rape scene was filmed[42]. Jodie Foster has not indicated any resentment over playing a sexually exploited girl in Scorsese's 1976 *Taxi Driver.* It is entirely within the control of lawmakers to leave some events consisting of unprotected speech uncriminalized. For example, at 11, Kirsten Dunst had to kiss Brad Pitt in *Interview With the Vampire*: she has expressed distaste for this and left it there. Lawmakers have also left citizens *over* 18 to fend for themselves with abusive images.

---

38 "It felt like suicide in the community to put your kid into a TV show and let him drop out of school at 16," Patel told The New York Times. "While everyone else's kid is off becoming a doctor or a dentist, I'm here on this TV show, simulating sex and taking drugs." https://www.mytalk1071.com/dev-patels-neighbours-were-horrified-by-his-skins-role/
   see also <u>Google</u> the complete strings: "simulating sex and taking drugs" " While everyone else's kid is off becoming a doctor" dev patel

39 https://www.theguardian.com/lifeandstyle/2014/dec/06/broke-shields-this-much-i-know

40 While the age for pictures was *sixteen* at the time of production. See 1984 amendment to §2256. The distribution in 2023 is clearly covered by the statute.   In other words, while production was not yet criminalized, a new law makes *recent* distribution a crime.

41 https://www.vulture.com/article/romeo-juliet-olivia-hussey-leonard-whiting-paramount-lawsuit.html

42 https://www.theguardian.com/film/2016/dec/04/actors-disgust-last-tango-paris-rape-scene-confession-bertolucci

Next, consider the nude 4-month-old infant Spencer Elden decorating Nirvana's *Nevermind* album as "art". Examining the act of production first, some might find physical injury is present in throwing a newborn who has just learned to breathe into cold water face down. At such a young age there is no memory (mental harm) *from production*. It may or may not have been a criminal act of child abuse to submerse Spencer in California. There is social value which prevents an obscenity finding. Finally, there is a strong argument that the parents validly waived Spencer's privacy in what they believed to be (and may have been) their son's best social interest. Others may weigh each of these "special facts" differently and for that reason should be determined by a jury. Examining the act of *distribution*, there is no physical harm, and the parent's waiver of privacy was also for public dissemination. Social value also carries over to negate obscenity. However, Spencer is now an adult asserting mental harm from recent distribution. Whether that claim is disingenuous a jury should determine, and related a court should determine whether he should be able to reclaim privacy rights (revoke waiver) as an adult.

Consider Traci Lords next, the 80's porn star who starred in over 100 films, most of which while 16 and 17, which was and is *above* the age of consent. It is also relevant that in the early 80's, the federal age *for pictures* was also sixteen[43]. Focusing on the "special facts" rather than personal opinion: Nobody has alleged she was physically harmed in any of her films, nor that a crime was committed *to* produce them (only *by* producing them, they say *the speech itself* is criminal), only one judge has said she was mentally harmed and "just didn't know it", and she very clearly waived privacy[44]. Now an American actress and singer, only she can shed light on any harms ("special facts") from her prior career before she transitioned to Hollywood and a double platinum music career.

---

43 In 1984 *only the photography age* was raised to eighteen; and for reasons highly relevant to the "special facts" of physical injury, mental harm, invasion of privacy, crime integral to speech, and [those represented by] obscenity.   See §2256

44 See US v X-Citement Video, 982 F.2d 285 (CA9 1992) (Kozinski dissenting) "As adults, those exploited as minors may be under pressure to rationalize their conduct, even though they bear no moral responsibility for it. Consider the words of the 24-year old Traci Lords: 'I don't think I did anything that special or weird or different'. The only difference was that I did it on video. Every teenage cheerleader runs around, screws half the football team, and takes drugs'" quoting Michael Kaplan, The House of Lords, Movieline, Jan/Feb 1993 @71, 72.

See also https://www.mamamia.com.au/traci-lords/ ("I was incredibly rebellious, very, very aggressive, wild, confused, angry young girl," Lords told NBC. "I was not an unwilling participant. I was acting out. I had a lot of damage. And I was spewing that all over the place.")

Streaking also fits under this very same rubric. First, *if* it can be shown that something is expressed by streaking, one might think that such expression is likely *un*protected by virtue of the criminal act of indecent public exposure --but who commits the crime is relevant to that special fact. If a person in the crowd[45] taking a picture (producer #2) did *not* influence the naked runner (producer #1), then the photographer didn't commit a criminal act to unprotect *his* production. Moving on, there is obviously no expectation of privacy in running naked across a public space, in fact it is expected that cameras are rolling and that it will appear on the news. No mental or physical harm occurs either. Only obscenity remains, and it may or may not be. Regret (if identified or caught) is not an unprotected characteristic.

Revenge porn also has several of these same "special facts" which *un*protect speech. By nature the "revenge" in revenge porn describes non-consensual dissemination[46] --a violation of privacy. Furthermore, mental anguish flows from a variety of sources including anxiety, knowing others are viewing the private content, and changes in social structure. This is especially true when co-workers, neighbors, or other sensitive social circles view it. Because at least one special fact is present, there is no need to look into physical injury or a criminal component.

Sextortion is the production analog to revenge porn's distribution. It is dubious that there would be any expression in a compelled sexual act, but if the showing were made, the First Amendment likely does not apply to laws criminalizing *compelled* speech. If anything, such a law mirrors the First Amendment *right to refrain* from speaking. If by some freak scenario a case slips past these powerful observations, almost every case of extortion involves mental harm, especially if sex or nude pictures is being extorted. Doubly so if the coerced act is done in an unusual manner or against the victim's personal morals. This alone is enough to *un*protect the production or receipt. The invasion of privacy is another "special fact" almost universally present in such cases.

---

45 Perhaps a coach filming the whole game, a parent memorializing their child's career, or the local news
46 Note that *production* is not discussed, because presumably most images are produced in the absence of unprotected special facts. That is, a very small group of malicious lovers might *produce* with revenge in mind before following through with distribution.

  *Receipt* and *possession* are also of special note. Whether intentional or accidental the First Amendment does not protect invading another's privacy, but the *Fifth Amendment's Due Process Clause* does require "fair notice" and would require some level of knowledge

Teen sexting, the hot-button topic of the century.   As should be clear now, age is *not* the operative inquiry[47]

and at most serves as a useful guidepost for the harms that judges and juries are perfectly capable of assessing.

It will be very difficult for defendants to show that their individual acts of producing, sharing, or viewing does *not*:

1) invade privacy; 2) involve physical injury; 3) inflict mental harm; 4) require a criminal act; and 5) isnt obscene.

It will also be very easy for police and prosecutors to demonstrate the presence of at least one of these harms.

Improperly referring to consensual private sexting between teens as *child* porn promotes disrespect for the law,

and causes citizens to question the seriousness of *all* child porn accusations, asking "was there really a child? Or

was it another prosecutor run amok?". Strict scrutiny survives in the form of an as-applied challenge, living on

in unprotected "categories" in the form of as-applied challenges, allowing statutes to stay on the books while

allowing a court to step in and determine who should be detained or set free[11]. There is a substantial amount of

recent literature documenting both sides, where harm does and does *not* occur. --Juries should decide, not judges,


It is a fruitless endeavor to attempt a rational definition of "child". Context matters, which is why the labels "child"

and "minor" range anywhere from under 13[48] to under 16[49], under 18[50] and even under 21. The accelerating velocity

of terminological in-exactitude must come to an abrupt halt. "Child Porn" is not a standard or a test --it never was--

in the Ferber plurality or elsewhere. Otherwise, a law using the word "minor"[47] would mean it goes beyond "child".


### Conclusion

Assuming a law reaches an image, a defendant must first demonstrate expression before triggering the above

constitutional inquiry into privacy, physical injury, mental harm, a criminal act, and obscenity  –the presence of

*any* of which would *un*protect expression. Child porn, revenge porn, virtual morphed porn, sextortion, deepfakes,

AI, and obscenity are not binding "categories" so much as society's convenient shorthand "general descriptions"[3].

These phrases are not the actual test they constitutionally require.

/s/ Tim Fredrickson

---

47 If it were, does the 1984 raise in age mean the legislature previously left some child porn unregulated? Does it still do so even at 18?
These difficult questions with opinions disguised as unprincipled answers are easily solved simply by focusing on the "special facts"
themselves while abandoning the phrase "child porn"  --keeping everything that phrase represents.
48 18§2241. Aggravated sexual abuse "(c) With **Children**-. ••• a person who has not attained the age of 12"
49 18§2243. Sexual abuse of a minor "(a) Of a **Minor**. ••• has attained the age of 12 years but has not attained the age of 16•••"
50 18§2256. Definitions for Chapter [110] "For the purposes of this chapter, the term- (1) '**minor**' means any person under the age of
eighteen years"



U.S. Department
Federal Bureau of
*Federal Corrections Institution*
*2113 North Highway 175*
*Seagoville, TX 75159-2237*
Official Business

⇔22005-026⇔
District Clerk Of Court Cdca
255 E Temple ST
LOS Angeles, CA 90012
United States

RECEIVED
CLERK, U.S. DISTRICT COURT

JUL 2 1 2025

CENTRAL DISTRICT OF CALIFORNIA
BY                        DEPUTY



